| | |
|---|---|
| CHRISTIN A. WRIGHT and KATHY L. BREIWICK, on behalf of themselves and all others similarly situated, | Case No. 09-CV-0443 (PJS/AJB) |
| Plaintiffs, | |
| v. | MEMORANDUM OPINION AND ORDER |
| MEDTRONIC, INC.; ARTHUR D. COLLINS, JR.; WILLIAM A. HAWKINS; VICTOR J. DZAU; SHIRLEY ANN JACKSON; DENISE M. O'LEARY; JEAN-PIERRE ROSSO; JACK W. SCHULER; RICHARD H. ANDERSON; ROBERT C. POZEN; DAVID L. CALHOUN; JAMES T. LENEHAN; KENDALL J. POWELL; GARY ELLIS; TERRY CARLSON; WARREN WATSON; DAVID NESS; GARY LUBBEN; KATIE SYZMAN; CAROL A. MCCORMICK; THE COMPENSATION COMMITTEE; THE QUALIFIED PLAN COMMITTEE; and JOHN DOES 1-10, | |
| Defendants. | |

Thomas J. McKenna, GAINEY & MCKENNA; and David E. Krause, KRAUSE & HOVLAND, CHTD, for plaintiffs.

Jeffrey B. Rudman, John J. Butts, and Steven F. Cherry, WILMER CUTLER PICKERING HALE & DORR LLP; and Patrick S. Williams, BRIGGS & MORGAN, P.A., for defendants.

Plaintiffs Christin Wright and Kathy Breiwick invested in the Medtronic, Inc. Savings

and Investment Plan ("the Plan") sponsored by their former employer, defendant Medtronic, Inc.

("Medtronic") and established pursuant to the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C. § 1001 et seq. Plaintiffs bring this putative class action against various

alleged Plan fiduciaries, including Medtronic itself, the Medtronic compensation and qualified-plan committees, and various named and unnamed corporate officers and directors. Plaintiffs allege that defendants breached various fiduciary duties and that those breaches resulted in losses for which defendants are now liable to the Plan under §§ 1109 and 1132(a)(2).[1] Plaintiffs also seek injunctive and monetary relief for a class of participants and beneficiaries under § 1132(a)(3). This matter is before the Court on defendants' Fed. R. Civ. P. 12(b)(6) motion to dismiss plaintiffs' first amended complaint and on plaintiffs' Fed. R. Civ. P. 15(a)(2) motion for leave to file a second amended complaint.

In this case, as in similar cases around the country, plaintiffs' attorneys have taken what is essentially a securities-fraud action and pleaded it as an ERISA action in order to avoid the demanding pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub. L. 104-67, 109 Stat. 737. Plaintiffs' attorneys are able to evade the PSLRA in this manner — as well as take advantage of the strict duties imposed on fiduciaries by ERISA — by suing not on behalf of those who purchased the stock of a company as members of the investing public, but instead on behalf of those who purchased the stock of a company as participants in a defined-contribution plan sponsored by that company. There is, of course, nothing wrong with bringing securities-fraud actions as ERISA actions, but these increasingly popular actions have given rise to numerous difficult legal issues, some of which have divided the federal courts.

After careful consideration, the Court grants defendants' motion to dismiss plaintiffs' first amended complaint. The Court also denies plaintiffs' motion to file the proposed second

---

[1]All citations to ERISA are to Title 29 of the United States Code.

amended complaint that is attached to their motion. The Court will, however, give plaintiffs an opportunity to file a third amended complaint that is consistent with this Order.

## I. MOTION TO DISMISS

### A. Background

Medtronic, a large medical-technology company, is the sponsor and administrator of the Plan. Am. Compl. ¶¶ 2, 20, 23; *see also* Am. Compl. Ex. C [hereinafter "Plan § ___"]. Plaintiffs allege that defendants breached their fiduciary duties during the class period (June 28, 2006 through November 18, 2008) by imprudently investing Plan assets in Medtronic stock. Am. Compl. ¶¶ 3-4. Plaintiffs further allege that defendants failed to provide complete and accurate information regarding Medtronic and the value of its stock. Am. Compl. ¶ 9. Plaintiffs bring various claims that are derivative of their "prudence" and "disclosure" claims, including claims that defendants failed to properly monitor the performance of their fiduciary appointees; that defendants failed to avoid or ameliorate their inherent conflicts of interest; that defendants breached their duty to disclose necessary information to their co-fiduciaries; and that defendants failed to prevent breaches by their co-fiduciaries.[2] Am. Compl. ¶¶ 6-8, 10.

The Plan is a "defined contribution plan" within the meaning of § 1002(34). Am. Compl. ¶ 58. According to the governing Plan document, the Plan consists of three principal components: an employee stock ownership plan ("ESOP"), a supplemental retirement plan, and a personal-investment plan. Plan §§ 1.1, 1.2. The Plan is funded by contributions from individual participants and by matching contributions from Medtronic. Am. Compl. ¶¶ 59, 65-67. Plan

---

[2]Not all of plaintiffs' claims are pleaded against every defendant. For purposes of ruling on defendants' motion to dismiss, however, it is not necessary to distinguish between the various defendants.

participants direct the investment of both their own contributions and Medtronic's matching

contributions into various investment options, including Medtronic stock. Am. Compl. ¶¶ 60,

67. All participant-directed investments in Medtronic stock are deemed to be held under the

ESOP component of the Plan. Plan § 1.1.

Plaintiffs' allegations of breach of fiduciary duty center on two patent-infringement

lawsuits in which Medtronic subsidiaries were involved: *Fastenetix, LLC v. Medtronic Sofamor

Danek, Inc.* ("*Fastenetix*") and *Cordis Corp. v. Medtronic AVE, Inc.* ("*Cordis*"). For ease of

reference, the Court will refer to both Medtronic and its subsidiaries as "Medtronic."

The *Fastenetix* lawsuit was filed in May 2006. Am. Compl. ¶ 96. Medtronic disclosed

the existence of *Fastenetix* in a Form 10-Q filed on September 3, 2008, shortly before the case

was settled for $37 million. Am. Compl. ¶¶ 96-97. Plaintiffs allege that most of Medtronic's

public filings during the class period (which, again, runs from June 2006 through

November 2008) were incomplete and misleading because they did not disclose the existence of

the *Fastenetix* litigation.[3] Am. Compl. ¶ 100. Plaintiffs further allege that the Form 10-Q filed

on September 3, 2008 was misleading because it said that "any potential loss is not currently

probable or reasonably estimable under SFAS No. 5." Am. Compl. ¶¶ 96-97. In fact, say

plaintiffs, Medtronic settled *Fastenetix* for $37 million just three weeks after making this

representation — and thus the representation was almost surely false in asserting that a potential

loss was neither "probable" nor "reasonably estimable" at the time.

---

[3]Plaintiffs allege — and the Court is assuming for purposes of its analysis — that
Medtronic's SEC filings were incorporated into the Plan's summary plan description ("SPD").
This Court has previously held that SEC filings that are incorporated into an SPD become
fiduciary communications for purposes of ERISA. *Morrison v. MoneyGram Int'l, Inc.*, 607 F.
Supp. 2d 1033, 1054-55 (D. Minn. 2009).

*Cordis* was filed in October 1997. Am. Compl. ¶ 98. Medtronic disclosed the existence

of the lawsuit in a Form 10-K filed in 2000, long before the beginning of the class period. *See*

Butts Decl., July 14, 2009 [hereinafter "Butts Decl."] Ex. G at 12. *Cordis* dragged on for over a

decade and featured two trials and multiple appeals to the United States Court of Appeals for the

Federal Circuit. Am. Compl. ¶ 98. The jury in the first trial found that Medtronic had infringed

Cordis's patents and awarded Cordis approximately $270 million, but the district court later

entered judgment as a matter of law in Medtronic's favor, finding that Medtronic had not

infringed Cordis's patents. *Id.* The Federal Circuit reversed the district court's decision and

remanded for further proceedings. A second trial was held, and a jury again found that

Medtronic had infringed Cordis's patents. *Id.* The district court deferred ruling on issues

relating to damages until after Medtronic appealed the finding of infringement. *Id.* The Federal

Circuit upheld that finding in January 2008, after which Medtronic recorded a $243 million

reserve for estimated damages. *Id.* Medtronic disclosed this reserve in the Form 10-Q that it

filed on September 3, 2008 — the same Form 10-Q that first disclosed the existence of the

*Fastenetix* litigation — and said the following about *Cordis*:

> A hearing date to address damages issues has not yet been set.
> The Company believes an unfavorable outcome in the matter is
> probable. In accordance with SFAS No. 5, Medtronic recorded a
> $243 [million] reserve in the third quarter of fiscal year 2008 for
> estimated damages in the matter. The range of potential loss
> related to this matter is subject to a high degree of estimation. The
> amount recorded represents an estimate of the low end of the range
> of probable outcomes related to this matter. At the time the reserve
> was recorded, the high end of the range was undeterminable, but
> the range of loss included the previous jury award of approximately
> $270 [million], which did not include post-judgment interest.
> When including post-judgment interest, the award would have
> equaled approximately $450 [million].

*Id.*

Plaintiffs allege that this disclosure was incomplete and inaccurate because (1) it failed to disclose that Cordis had filed a motion seeking entry of final judgment in the amount of about $521 million (which included both damages and interest) and (2) there was no reasonable basis for establishing a $243 million reserve. Am. Compl. ¶ 99. In September 2008, the district court entered judgment in Cordis's favor. Butts Decl. Ex. D at 8 (Medtronic Form 10-Q filed Dec. 3, 2008).[4] With interest, the total award was approximately $521 million. *Id.* About a month later, Medtronic and Cordis settled the matter for $472 million. *Id.*

On November 18, 2008 — the last day of the proposed class period — Medtronic announced an after-tax charge of $176 million in connection with "certain litigation." Am. Compl. ¶ 92. As explained in a later SEC filing, this charge was for the *Fastenetix* and *Cordis* settlements. Am. Compl. ¶ 94. Plaintiffs allege that, as a result of this litigation charge, Medtronic's net earnings for the second quarter of 2008 were $571 million, which was a decrease of 14 percent from the same period in the prior year. Am. Compl. ¶ 92. After this announcement, Medtronic's stock price dropped by 13 percent. Am. Compl. ¶ 93.

---

[4]Defendants cite Medtronic's December 3, 2008 Form 10-Q to support their assertions about the judgment and settlement in *Cordis*. At this stage of the proceedings, the factual assertions in Medtronic's SEC filings may not be treated as true unless the parties consent. *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 832 (8th Cir. 2003) (noting that courts may consider SEC filings on a motion to dismiss where the filings are not offered to prove the truth of the matters asserted). Plaintiffs do not dispute defendants' characterizations of the judgment and settlement, and thus the Court treats those characterizations as true for purposes of defendants' motion.

*B. Analysis*

1. Standard of Review

In reviewing a Rule 12(b)(6) motion, a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir. 2003). Although the factual allegations in the complaint need not be detailed, they must be sufficient to "raise a right to relief above the speculative level . . . ." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, a Rule 12(b)(6) motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment. *Mattes*, 323 F.3d at 697 n.4.

2. The Scope of a Fiduciary's Duties under ERISA

The fiduciaries of an ERISA plan have responsibilities to participants and beneficiaries of the plan that are similar to the responsibilities imposed on fiduciaries under the common law of trusts. *See Pegram v. Herdrich*, 530 U.S. 211, 224 (2000). But unlike the common law of trusts, ERISA permits a fiduciary to take an action adverse to beneficiaries, as long as the fiduciary is not acting in his capacity as a fiduciary when he takes the adverse action. *Id.* at 225-26; *see also* § 1002(21)(A) (providing that a person is a fiduciary "to the extent" that he exercises certain types of authority or control over the plan or its assets). To establish that a particular action was a breach of fiduciary duty, then, it is not sufficient to prove that the person who took the action

was a plan fiduciary. The plaintiff must also prove that, at the time that the person took the

action, he was *acting* as a plan fiduciary. *Pegram*, 530 U.S. at 226.

Under ERISA, a plan fiduciary's responsibilities include the following:

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
>> (A) for the exclusive purpose of:
>>
>>> (i) providing benefits to participants and their beneficiaries; and
>>>
>>> (ii) defraying reasonable expenses of administering the plan;
>>
>> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>>
>> (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>>
>> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

§ 1104(a)(1). The duties set forth in § 1104(a)(1) are commonly referred to as the duty of

loyalty, the duty of prudence, the duty to diversify, and the duty to follow the terms of the plan.

*See Brown v. Am. Life Holdings, Inc.*, 190 F.3d 856, 859 (8th Cir. 1999); Craig C. Martin et al.,

*What's Up on Stock-Drops?* Moench *Revisited*, 39 J. Marshall L. Rev. 605, 608-09 (2006).

Not all of these duties are imposed on every benefit plan governed by ERISA. In particular, a type of defined-contribution plan known as an "eligible individual account plan" (or "EIAP") is exempt from several of the requirements that ERISA generally imposes on benefit plans. *See* § 1107(d)(3) (defining EIAPs). For example, EIAPs are not subject to the ten percent cap on investments in employer stock, § 1107(b)(1), and ERISA's prohibitions against dealing with a party in interest and self-dealing do not apply to an EIAP's acquisition or sale of employer stock, § 1108(e). In addition, an EIAP's acquisition or holding of employer stock cannot be the basis of a claim that a fiduciary has violated the duty to diversify: "In the case of an eligible individual account plan . . . the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities . . . ." § 1104(a)(2). These exemptions are necessary to enable EIAPs to fulfill one of their recognized purposes: to foster employee investment in employer securities. *See Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007).

### 3. Count I (Duty of Prudence)

In Count I of the first amended complaint, plaintiffs allege that defendants breached their duty of prudence by investing Plan assets in Medtronic stock, which plaintiffs allege was a "highly speculative and risky investment in light of [Medtronic's] fundamental weaknesses." Am. Compl. ¶ 128. Medtronic moves to dismiss this claim on the ground that, because the Plan is an ESOP (or at least an EIAP), the Plan's decision to invest in Medtronic stock is entitled to a presumption of prudence that can be overcome only by pleading facts demonstrating that Medtronic stock was so risky that the Plan's fiduciaries should not have invested *any* of the

Plan's assets in it. Because plaintiffs have failed to allege such facts, Medtronic contends, Count I must be dismissed. The Court agrees with Medtronic.

In the landmark case of *Moench v. Robertson*, 62 F.3d 553 (3d Cir. 1995), an ESOP participant sued the plan's fiduciaries over their decision to keep the plan's assets invested almost entirely in employer stock during a period in which that stock lost nearly 99 percent of its value. *Id.* at 557, 559-60. *Moench* recognized that ESOPs are, by definition, designed to invest primarily in employer stock. *Id.* at 568. At the same time, ESOP fiduciaries must fulfill the duties of prudence and loyalty. *Id.* at 569. To balance these potentially competing considerations, *Moench* applied a presumption of prudence to the decision of an ESOP fiduciary to invest plan assets in employer stock. *Id.* at 571. To overcome the presumption, a plaintiff must show that the fiduciary abused its discretion. *Id.*

This Court recently applied *Moench* in *Morrison v. MoneyGram International, Inc.*, 607 F. Supp. 2d 1033 (D. Minn. 2009). In *Morrison*, the Court came to three conclusions that are critical for purposes of this case: First, the *Moench* presumption is not limited to ESOPs, but extends to all EIAPs. *Id.* at 1051. Second, the *Moench* presumption applies at the pleading stage and requires plaintiffs to allege sufficient facts to demonstrate that they have a non-speculative claim that the fiduciary abused its discretion — that is, acted in a manner that would overcome the *Moench* presumption. *Id.* Finally, "'an abuse of discretion under [*Moench*] begins (and the presumption of prudence ends) at the point at which company stock becomes so risky that no prudent fiduciary, reasonably aware of the needs and risk tolerance of the plan's beneficiaries, would invest *any* plan assets in it, regardless of what other stocks were also in that plan's portfolio.'" *Id.* at 1053 (quoting *In re Ford Motor Co. ERISA Litig.*, 590 F. Supp. 2d 883, 893

(E.D. Mich. 2008) (alteration in *Morrison*)). In this case, then, plaintiffs' prudence claim can survive only if they have alleged sufficient facts to demonstrate that they have a non-speculative claim that investing in Medtronic stock during the class period was so risky that no prudent fiduciary would have invested *any* Plan assets in Medtronic stock.

Applying this standard, the Court readily concludes that plaintiffs have failed to plead sufficient facts to overcome the *Moench* presumption. Plaintiffs allege that, as a result of a one-time litigation charge, Medtronic's net earnings for the second quarter of 2008 were 14 percent below what they had been for the same period in the previous year and that, after these results were announced, Medtronic's stock price dropped 13 percent. These allegations do not remotely approach the type of allegations that courts have found sufficient to overcome the *Moench* presumption.[5] There is no allegation in this case that the litigation charge taken by Medtronic

---

[5] *See, e.g., Edgar v. Avaya, Inc.*, 503 F.3d 340, 347 (3d Cir. 2007) (affirming dismissal where plaintiff's allegations, if proven, would establish only that the company was undergoing developments that were likely to have a negative effect on the company's earnings and stock price); *Wright v. Or. Metallurgical Corp.*, 360 F.3d 1090, 1098-99 (9th Cir. 2004) (72 percent drop in stock price after merger was insufficient to state a claim in light of the fact that the employer was profitable and paying substantial dividends); *In re Citigroup ERISA Litig.*, No. 07-9790, 2009 WL 2762708, at *18-19 (S.D.N.Y. Aug. 31, 2009) (dismissing prudence claim where stock price dropped 52 percent); *In re Bausch & Lomb Inc. ERISA Litig.*, No. 06-6297, 2008 WL 5234281, at *6 (W.D.N.Y. Dec. 12, 2008) (dismissing prudence claim where, despite allegations of improper revenue recognition and adverse corporate developments, plaintiffs failed to plead facts demonstrating that the company's financial situation was seriously deteriorating); *In re Dell, Inc. ERISA Litig.*, 563 F. Supp. 2d 681, 694 (W.D. Tex. 2008) (dismissing prudence claim where allegations failed to show that the company's survival was threatened or the stock was in danger of becoming worthless); *In re Duke Energy ERISA Litig.*, 281 F. Supp. 2d 786, 794-95 (W.D.N.C. 2003) (rejecting prudence claim where SEC filings cited in the complaint demonstrated that the employer was a viable, strong company with substantial assets); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 702 (7th Cir. 2008) (explaining in dicta that claim based on charge against earnings representing less than two percent of yearly revenue would likely be insufficient to state a claim); *Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 255-56 (5th Cir. 2008) (affirming summary judgment on prudence claim where stock dropped 40 percent after

(continued...)

represented a substantial portion of Medtronic's assets or put the company's profitability, much

less the company's health, at risk.[6]  At bottom, plaintiffs have failed to allege facts suggesting

that investing in the stock of Medtronic — which, as far as one can tell from the first amended

complaint, was a profitable, healthy company — was so risky that a prudent fiduciary would not

invest a single cent of Plan assets in that stock.

Perhaps recognizing that they cannot overcome the *Moench* presumption, plaintiffs

contend that the presumption does not even apply in this case because the Plan is not a true

ESOP.  Plaintiffs argue that, because the ESOP component forms just one part of the Plan, the

Plan itself does not qualify as an ESOP.[7]  *See* § 1107(d)(6) (defining an ESOP in part as a plan

"designed to invest primarily in qualifying employer securities").  Defendants respond that,

whether or not the Plan is an ESOP, it is certainly an EIAP, which is defined as, among other

---

[5](...continued)
disclosure of improper "round-trip" energy trading); *Moench*, 62 F.3d at 557 (reversing summary
judgment where employer's stock lost 98 percent of its value over a period of two years, there
were allegations of serious mismanagement, regulatory authorities had expressed concerns about
the health of the employer's subsidiaries, and the employer ultimately went out of business);
*Morrison*, 607 F. Supp. 2d at 1053-54 (denying motion to dismiss where employer pursued an
extraordinarily speculative and unnecessary investment strategy that ultimately caused losses of
$1.6 billion and in light of which the employer's stock lost 92 percent of its value, the SEC
initiated an investigation into its accounting practices, and the employer was forced to seek a
large infusion of outside capital).

[6]To provide context:  The Form 10-K filed by Medtronic in June 2008 reported that
Medtronic's revenue in fiscal year 2008 was more than $13.5 billion and its net earnings were
over $2.2 billion.  Butts Decl. Ex. F at Ex. 13 at 34; *see also* Am. Compl. ¶ 100 (citing
Medtronic's fiscal 2008 Form 10-K).  The Court does not take these statements as true, but
simply to illustrate why it may not have been risky to invest in Medtronic stock despite the
pendency of the *Cordis* and *Fastenetix* actions.

[7]Plaintiffs apparently concede that at least one portion of the Plan is an ESOP.  Hr'g
Tr. 73, Dec. 4, 2009 (stating that "the only ESOP component of it is the legacy in counts that
were left from the prior plan").

things, an individual account plan that is "a profit-sharing, stock bonus, thrift, or savings plan" that "explicitly provides for acquisition and holding of qualifying employer securities . . . ." § 1107(d)(3); *see also* § 1107(d)(5) (defining "qualifying employer security" as, among other things, "stock"); § 1002(34) (defining "defined contribution plan" as synonymous with "individual account plan"); Plan § 1.3 ("The purposes of the ESOP are to provide a means for Employees to acquire an ownership interest in the Company . . . ."). Plaintiffs have not attempted to rebut defendants and explain why the Plan is not an EIAP. In fact, after being pressed on the point at oral argument, plaintiffs conceded that they "think" the Plan is an EIAP.[8] Hr'g Tr. 92, Dec. 4, 2009. If the Plan is an EIAP, then the *Moench* presumption applies. *Morrison*, 607 F. Supp. 2d at 1051.

Rather than seriously dispute that the Plan is an EIAP, plaintiffs instead argue that, whether or not the Plan is an EIAP, the *Moench* presumption should not apply because the Plan did not force defendants to invest in Medtronic stock. A few courts seem to agree that the *Moench* presumption is inapplicable when, under the terms of a plan, the fiduciaries are neither forced nor encouraged — but merely permitted — to invest in employer stock. *See, e.g.*, *Urban v. Comcast Corp.*, No. 08-773, 2008 WL 4739519, at *12 (E.D. Pa. Oct. 28, 2008) (stating that *Moench* and *Edgar* established three levels of scrutiny depending on whether investment in employer stock is mandatory, encouraged, or merely permitted); *see also In re Schering-Plough*

---

[8]The Court has difficulty understanding why plaintiffs have been coy on this subject. If the Plan were *not* an EIAP, it would almost certainly violate various provisions of ERISA from which EIAPs are exempt, such as the duty to diversify. Yet plaintiffs have not claimed any such violations. In fact, plaintiffs have *disclaimed* any allegation of breach of the duty to diversify. *See* Docket No. 22 at 18 n.14. This is fairly clear evidence that plaintiffs recognize that the Plan is an EIAP.

*Corp. ERISA Litig.*, 420 F.3d 231, 238 n.5 (3d Cir. 2005) (stating that *Moench* was inapplicable because the fiduciaries were "'simply permitted'" to make investments in employer securities (quoting *Moench*, 62 F.3d at 571)).  Plaintiffs urge this Court to go further and hold that the *Moench* presumption does not apply unless, under the terms of the plan, the fiduciaries have no choice but to invest in employer stock.  This argument misconstrues *Moench*.

The *Moench* court examined the standard of review generally applicable to a fiduciary's decision to invest in employer stock.  *Moench*, 62 F.3d at 571.  Under the common law of trusts, *Moench* explained, a fiduciary's decision to invest in a particular stock is normally subject to de novo review unless the investment is mandated by the terms of the trust, in which case the fiduciary's decision is essentially unreviewable.  *Id.*  The court found that this all-or-nothing approach was not appropriate in the context of the ESOP that was at issue in *Moench* because "the fiduciary is not absolutely required to invest in employer securities but is more than simply permitted to make such investments . . . ."  *Id.*  Accordingly, the court held that the fiduciary's decision to continue investing in employer stock should be reviewed for an abuse of discretion. *Id.*  Thus, the *Moench* presumption was invented and applied in a case in which the fiduciary was *not* forced (but merely encouraged) to invest in employer stock.

It is true that, under this analysis, one could argue that unless the plan at issue at least *encourages* investment in employer stock, the fiduciary's decision to invest in such stock (or to permit participants to invest in such stock) should not be sheltered by the presumption of prudence.  Even if the Court were to accept that argument, however, the decision of the Plan's fiduciaries to permit investment in Medtronic stock would seem to be protected by the presumption, inasmuch as the Plan provides that it "shall" consist of, among other things, an

ESOP "designed to invest primarily in Company Stock . . . ." Plan §§ 1.1; *see also* Plan § 7.4 ("The ESOP shall be invested primarily in Company Stock."). Plaintiffs point out (and defendants do not dispute) that defendants retained discretion to eliminate the ESOP and the Medtronic stock fund. Again, though, that fact does not distinguish this case from *Moench* or *Edgar*. *See Moench*, 62 F.3d at 568 ("we have no hesitation concluding that the Statewide ESOP, while designed with the primary purpose of investing in Statewide securities, did not absolutely require the Committee to invest exclusively in Statewide stock"); *Edgar*, 503 F.3d at 347 n.11 ("There is also no dispute that, as in *Moench*, defendants retained limited discretion not to offer Avaya common stock as an investment option."). A plan can encourage investment in employer stock and yet leave open the possibility of eliminating that option under unusual circumstances.

But more important (at least in this Court's view) is the fact that the *Moench* presumption is the logical consequence of ERISA's exemption of EIAPs from the duty to diversify. § 1104(a)(2). An allegation that the fiduciaries of an EIAP held too much employer stock is indistinguishable from an allegation that the fiduciaries of the EIAP did not sufficiently diversify the plan's assets; it is, at bottom, an allegation that the fiduciaries invested too much money in one asset (employer stock), and too little money in other assets (non-employer stock). Such a failure-to-diversify claim is expressly barred by § 1104(a)(2). Thus, a plaintiff can state a viable prudence claim only by alleging that the EIAP fiduciaries should not have invested (or permitted the investment of) *any* plan assets in employer stock.[9] *See Morrison*, 607 F. Supp. 2d at 1051

---

[9] For this reason, it is somewhat misleading to say, in the context of a Rule 12(b)(6) motion, that the Court is applying a "presumption" or that a plaintiff must plead sufficient facts

(continued...)

("To get around MoneyGram's exemption from the duty to diversify, plaintiffs must allege that MoneyGram stock was such an imprudent investment that *no* Plan assets — not one cent — should have been invested in it.").  And because § 1104(a)(2) exempts all EIAPs from the duty to diversify — whether or not a particular EIAP gives the fiduciary discretion to eliminate the employer-stock fund — the *Moench* presumption likewise applies to all EIAPs.

Finally, plaintiffs argue that, because the value of Medtronic's stock was artificially inflated during the class period, it *was* imprudent for defendants to invest even a single cent of Plan Assets in Medtronic stock.  Plaintiffs' argument is straightforward:  It is imprudent for a fiduciary to buy any stock that is selling at, say, $20 per share, when the fiduciary knows that the real value of the stock is only, say, $15.  The fiduciary is just throwing $5 per share out the window.  The fiduciary of an EIAP therefore breaches the duty of prudence when he invests *any* plan assets in the stock of an employer — even if the employer is profitable and robustly healthy — if the fiduciary knows that the employer's stock is overpriced.

This argument has not fared well with other courts:

> Kirschbaum contends that the court's presumption in favor of continued company stock investment should not apply at all where allegations, like his, relate to the fiduciaries' knowing purchases of stock at an artificially inflated price. . . . We reject this limitation.  The distinction between these allegations is not only often elusive, but hardly justified by *Moench* itself. . . . More to the point, there is no principled difference between how a fiduciary should respond to "artificial inflation" of the stock price as opposed to other sorts of negative insider information.  Consequently, the standard of

---

⁹(...continued)
to "overcome" it.  A plaintiff who has failed to plead facts that, if proven, would establish that an EIAP should not have invested in any employer stock has failed to state a claim, not failed to overcome a presumption.  Nevertheless, as the parties and the case law generally use these terms, the Court follows suit.

> judicial review applicable to such decisions should not generally
> turn on pleading artifices. The *Moench* presumption logically
> applies to any allegations of fiduciary duty breach for failure to
> divest an EIAP or ESOP of company stock.

*Kirschbaum v. Reliant Energy, Inc.*, 526 F.3d 243, 254 (5th Cir. 2008).

The Court agrees with this analysis. Allowing plaintiffs to evade the *Moench*

presumption merely by pleading that the stock was artificially inflated for one reason or another

would eviscerate the presumption. This is not to say that allegations of artificial inflation could

never be sufficient to show that an employer's stock was so excessively risky that not a penny of

Plan assets should have been invested in it. The allegations in this case, however, do not come

close to meeting this standard. Count I of plaintiffs' first amended complaint is therefore

dismissed.[10]

### 4. Count V (Duty of Loyalty/Duty of Disclosure)

Count V of plaintiffs' first amended complaint seeks recovery for breach of the duty of

loyalty. The duty of loyalty "includes the obligation to deal fairly and honestly with all plan

members" and "requires an ERISA fiduciary to communicate any material facts which could

adversely affect a plan member's interests." *Shea v. Esensten*, 107 F.3d 625, 628 (8th Cir. 1997);

*see also Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (stating that the duty

of loyalty imposes disclosure obligations in addition to those specified in ERISA and its

associated regulations). In Count V, plaintiffs allege that Medtronic breached its duty of loyalty

---

[10]Plaintiffs also allege, in Count I, that defendants breached their duty of loyalty because
they failed to avoid conflicts of interest inherent in their dual role as fiduciaries and corporate
insiders who were compensated in part with Medtronic stock options. Without an underlying
breach of duty, however, the allegation that defendants had conflicts of interest does not give rise
to a claim. *See Pegram*, 530 U.S. at 225 (ERISA fiduciaries are permitted to have interests
adverse to those of plan participants).

by (1) failing to disclose the *Fastenetix* litigation until September 2008 and (2) disseminating misleading and incomplete information about the likely outcomes of *Fastenetix* and *Cordis*.

"Information is material if there is a substantial likelihood that nondisclosure 'would mislead a reasonable employee in the process of making an adequately informed decision regarding benefits to which she might be entitled.'" *Braden*, 588 F.3d at 599 (quoting *Kalda v. Sioux Valley Physician Partners, Inc.*, 481 F.3d 639, 644 (8th Cir. 2007)). As plaintiffs stress, "[m]ateriality is a fact intensive issue which can be decided as a matter of law only if no reasonable trier of fact could disagree." *Id.* But the question now before this Court is not whether, as a matter of law, defendants' alleged nondisclosures *were* material; the question now before the Court is whether plaintiffs have adequately *alleged* that the nondisclosures were material.

As to *Fastenetix*, plaintiffs allege that defendants breached their fiduciary duties by failing to disclose the existence of the *Fastenetix* litigation for over two years and by falsely representing, three weeks before *Fastenetix* settled, that any potential loss relating to the *Fastenetix* case was "not currently probable or reasonably estimable under SFAS No. 5." Am. Compl. ¶¶ 96-97. As discussed above, though, *Fastenetix* ultimately settled for just $37 million, Am. Compl. ¶ 97 — a drop in the bucket for a large enough company. Plaintiffs have not alleged a single fact indicating that $37 million represented a material part of Medtronic's assets or revenues. Without such an allegation, plaintiffs have failed to plead facts sufficient to "raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555.

As to *Cordis*, plaintiffs allege that defendants breached their fiduciary duties by disseminating inaccurate and misleading information about the *Cordis* litigation. Plaintiffs do

not dispute that Medtronic disclosed the existence of the *Cordis* litigation long before the beginning of the class period. Rather, plaintiffs focus their allegations on what Medtronic said about *Cordis* in the Form 10-Q filed in September 2008. In that Form 10-Q, Medtronic disclosed that "an unfavorable outcome in the matter is probable," that Medtronic had recorded a $243 million reserve for estimated damages, that this amount was at the "low end of the range of probable outcomes," and that, while the high end of probable outcomes was "subject to a high degree of estimation," it would reach at least $450 million. Am. Compl. 98.

Plaintiffs fault this disclosure for two reasons. First, plaintiffs complain that Medtronic did not disclose that Cordis had filed a motion seeking reinstatement of the previous jury verdict and interest, for a total award of approximately $521 million. And second, plaintiffs complain that there was no reasonable basis for setting the reserve at $243 million when it was probable that the district court would reinstate the previous jury verdict and award interest.

As to the latter complaint (about the reserve): In setting the reserve, Medtronic was acting in its corporate capacity, not in its capacity as an ERISA fiduciary. Plaintiffs thus cannot bring a claim against Medtronic for setting the reserve too low. Plaintiffs try to overcome this hurdle by insisting that their complaint is not that Medtronic set the reserve too low, but that, in setting the reserve too low, Medtronic *communicated* something about the anticipated damage award, and that *communication* was misleading. This is a distinction without a difference. Whatever inference there is to be drawn about the reserve stems from Medtronic's act of setting the amount of the reserve, and that was a corporate act, not a fiduciary act.

Medtronic-as-fiduciary's communication to Plan participants accurately reported that Medtronic-as-corporation had set the reserve at $243 million. It is difficult to know how such a

truthful disclosure could violate ERISA.  The only way that Medtronic-as-fiduciary could be liable for accurately reporting the amount of the reserve is if Medtronic-as-fiduciary somehow had a duty to second-guess the application of accounting principles by Medtronic-as-corporation when Medtronic-as-fiduciary informed Plan participants of the reserve set by Medtronic-as-corporation.  Stringent though the fiduciary duties imposed under ERISA may be, the Court does not believe that they extend so far.  No judicial opinion of which this Court is aware suggests that Medtronic-as-fiduciary had a duty to (1) monitor all actions that were undertaken by Medtronic-as-corporation and that were accurately disclosed by Medtronic-as-corporation in SEC filings and (2) warn Plan participants not to draw potentially misleading inferences from those corporate actions and disclosures.  Such a duty would be both capacious and unmanageable.[11]

Even if Medtronic-as-fiduciary had a duty to correct misunderstandings that might arise from the accurate disclosure of the fact that Medtronic-as-corporation had set a $243 million reserve, Medtronic-as-fiduciary's other disclosures would have fulfilled that duty.  Medtronic made clear that "an unfavorable outcome in the [*Cordis*] matter is probable," and that the $243 million reserve merely "represents an estimate of the low end of the range of probable outcomes."  Medtronic likewise made clear that the *high* end of the "range of probable outcomes" was very difficult to estimate, but that it was at least $450 million, which represented the previous jury award of $270 million plus interest.  Plaintiff cannot point to any material information that this description omits — nor to any material information that this description

---

[11]By way of example, suppose that Medtronic embarked on an ambitious expansion plan under which it built lavish new headquarters and many new state-of-the-art manufacturing facilities.  A clever plaintiff could complain that a fiduciary communication that accurately described these activities misleadingly implied that Medtronic expected its business to grow.

misstates — save for the fact that it does not disclose that Cordis had filed a motion asking the judge to enter judgment in the amount of $521 million.

No reasonable jury could find, based on the allegations in the first amended complaint, that Medtronic's failure to disclose that Cordis had filed its motion was material. Medtronic disclosed that it was likely to lose the *Cordis* action and that the high end of the range of possible outcomes exceeded $450 million. The first amended complaint alleges no facts to support a conclusion that the difference between this disclosure and the disclosure that plaintiffs contend Medtronic should have made — that Cordis was seeking $521 million — was material. Even aggregating the $71 million of allegedly undisclosed risk in *Cordis* (only $22 million of which ultimately materialized) with the $37 million allegedly undisclosed settlement in *Fastenetix*, plaintiffs have failed to allege any facts that would support a conclusion that the undisclosed amounts are material.

As Medtronic points out, securities regulations do not require public corporations to disclose litigation unless the amount involved, *exclusive* of interest and costs, exceeds ten percent of the corporation's current assets. 17 C.F.R. § 229.103 ¶ 2. This action is not governed by securities law, of course, but § 229.103 nevertheless represents a considered judgment about what disclosures regarding litigation would be material to investors, including employee-investors. With that in mind, it is telling that the aggregate amount of the allegedly undisclosed risk ($108 million, *including* interest and costs [12]) is approximately *one-half of one percent* of the

---

[12]This is assuming that Medtronic would be required to disclose the $71 million in interest despite the regulation's exclusion of interests and costs for purposes of determining whether disclosure is required.

$22.2 billion in assets reported in Medtronic's June 2008 Form 10-K. *See* Butts Decl. Ex. F at Ex. 13 at 35.

At this stage of the litigation, the Court cannot assume that the statements made in Medtronic's Form 10-K are true; specifically, the Court cannot assume that Medtronic in fact had over $22 billion in assets. The Court mentions those statements only to highlight the fact that pleading $108 million in undisclosed risk is not the same as pleading facts that would support a finding that $108 million in undisclosed risk is material. *Cf. Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997) (holding that an alleged $6.8 million overstatement of assets was immaterial because it represented only two percent of the company's total assets). By failing to plead any facts that would support a conclusion that Medtronic's nondisclosure of $108 million in litigation risk was material, plaintiffs have failed to plead facts sufficient to "raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. For that reason, Count V is dismissed.

### 5. Remaining Counts

Plaintiffs' remaining claims include Count II (Failure to Monitor Fiduciaries), Count III (Failure to Avoid Conflicts of Interest), Count IV (Failure to Disclose Necessary Information to Co-Fiduciaries), and Count VI (Co-Fiduciary Liability). All of these claims are derivative of plaintiffs' prudence and disclosure claims. As the prudence and disclosure claims have been dismissed, plaintiffs' remaining claims likewise fail. *See In re Harley-Davidson, Inc. Sec. Litig.*, 660 F. Supp. 2d 953, 968-69 (E.D. Wis. 2009). The Court therefore grants defendants' motion to dismiss the first amended complaint in its entirety.

## II.  MOTION TO AMEND

Plaintiffs move pursuant to Fed. R. Civ. P. 15(a)(2) for leave to file a second amended complaint ("SAC"), a copy of which is attached to their motion.  Referring to the SAC as an "amended" complaint is a bit of a misnomer.  Although the SAC proposes the same class period as the first amended complaint (June 28, 2006 through November 18, 2008), it barely mentions the *Fastenetix* and *Cordis* actions, and does not contain new allegations relating to either of those matters.  For that reason, plaintiffs' motion is denied insofar as plaintiffs seek to replead their *Fastenetix* and *Cordis* claims.  Without any new allegations, those claims would have to be dismissed for the reasons described above, and thus amendment would be futile.

In fact, though, plaintiffs have pretty much abandoned their *Fastenetix* and *Cordis* claims. Instead of continuing to pursue those claims, they wish to commence what is essentially a brand new ERISA action — an ERISA action that, like their former ERISA action, is at its core a securities-fraud action.  In their SAC, plaintiffs continue to allege that defendants breached their duty of prudence by investing in Medtronic stock.  But now plaintiffs allege that investing in Medtronic stock was imprudent not because of the *Fastenetix* and *Cordis* lawsuits, but because of costly problems that Medtronic experienced with two of its products: the Fidelis lead (a wire that connects an implantable defibrillator to the heart muscle) and the Infuse bone graft product (a bone-filling material that contains a bone protein).  Plaintiffs also allege that defendants breached their duty of loyalty by (1) failing to disclose problems with the Fidelis lead that caused Medtronic to withdraw it from the market in October 2007 and (2) failing to disclose various material facts about Infuse, including that Medtronic was unlawfully promoting off-label uses of

Infuse, that a majority of Infuse sales were for off-label use, and that the dangers of off-label use of Infuse put Medtronic's Infuse business at risk.

Under Rule 15(a)(2), leave to amend a complaint before trial should be freely given "when justice so requires." Defendants argue that the Court should deny leave in this case because plaintiffs unduly delayed bringing their new allegations about Fidelis and Infuse. As defendants point out, the same or similar allegations about Fidelis and Infuse have been brought in three other cases in this district — cases that were filed many months before plaintiffs brought their current motion. *See Brown v. Medtronic, Inc.*, 619 F. Supp. 2d 646 (D. Minn. 2009) (ERISA action); *Mpls. Firefighters' Relief Assoc. v. Medtronic, Inc.*, No. 08-6324 (D. Minn. filed Dec. 10, 2008) (securities-fraud action); *In re Medtronic Inc. Sec. Litig.*, 618 F. Supp. 2d 1016 (D. Minn. 2009) (securities-fraud action). According to defendants, there is no excuse for plaintiffs' failure to bring their claims earlier, and this failure has caused the Court and defendants to waste substantial time and effort in dealing with plaintiffs' piecemeal litigation tactics.

The Court is sympathetic to defendants. There is no reason why plaintiffs could not have brought the Fidelis and Infuse allegations before putting defendants through the effort and expense of briefing a motion to dismiss the first amended complaint. Moreover, defendants are correct that plaintiffs' delay seems calculated. Plaintiffs first sought to intervene in the *Brown* case. While plaintiffs' motion to intervene in *Brown* was pending, defendants moved to dismiss the first amended complaint in this case. The parties then undertook extensive and complex briefing on that motion. Only after plaintiffs' motion to intervene in *Brown* was denied — and after briefing was complete on defendants' motion in this case — did plaintiffs bring their

-24-

motion to amend. The only possible explanation for this delay is that plaintiffs' preference was to split their claims, litigating before one judge their claim that the drop in the price of Medtronic stock in late 2008 was due to disclosures about the *Fastenetix* and *Cordis* lawsuits, while litigating before another judge their (inconsistent) claim that the same drop in the price of Medtronic stock was due to disclosures about the Fidelis and Infuse products.

That said, the Court will not deny plaintiffs' motion to amend on the basis of delay. "Delay alone is not enough to deny a motion to amend; prejudice to the nonmovant must also be shown." *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 841 (8th Cir. 2004). The Court recognizes that defendants will incur some additional expense as a result of plaintiffs' maneuvering, but that expense is likely to be relatively small. Defendants have already briefed a motion to dismiss the Fidelis and Infuse allegations on the merits in *Brown*[13] — and defendants have essentially done the same here, in the course of arguing that plaintiffs' proposed amendments are futile. The Court also notes that this case is a putative class action and, as is evidenced by the multiple other cases bringing similar allegations, there are likely to be current or former Medtronic employees who would bring similar claims against defendants if this Court denied plaintiffs' motion to amend. In other words, one way or another, Medtronic is going to have to defend the allegations regarding the Fidelis and Infuse products, and defending those allegations in this action is not going to cost Medtronic more than defending those allegations in some other action.

Defendants next argue that plaintiffs' motion to amend should be denied because their proposed amendments are futile. Having slogged through the proposed SAC, the Court does not

---

[13]Judge Kyle dismissed *Brown* for lack of subject-matter jurisdiction and thus did not reach the merits. *Brown*, 619 F. Supp. 2d at 652.

agree.  Plaintiffs have a number of hurdles to overcome, but the Court is not yet prepared to find that it is impossible for plaintiffs to plead viable claims with respect to the Fidelis and Infuse products.  But the Court will nevertheless deny plaintiffs' motion to file their proposed SAC.

The reason why plaintiffs are pleading what is essentially a securities-fraud action as an ERISA action is to evade the pleading requirements of the PSLRA (as well as Fed. R. Civ. P. 9(b)).  As a result, plaintiffs' proposed SAC is governed by Fed. R. Civ. P. 8.  That rule requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This is both a floor and a ceiling:  Rule 8 can be violated by a complaint that pleads too little and by a complaint that pleads too much. The proposed SAC — a 172-page, 458-paragraph, monstrosity of a complaint — manages to do both.

The first problem with the SAC is that it includes a prudence claim without pleading facts sufficient to overcome the *Moench* presumption.  As noted, the SAC covers the same class period as plaintiffs' first amended complaint, and contends that plaintiffs were injured by the same drop in the price of Medtronic stock.  Although plaintiffs have latched onto a new theory to explain that drop, they still do not plead allegations that, if proven, would demonstrate that Medtronic stock was so risky that a prudent fiduciary would not have invested a penny of Plan assets in it.  As the Court stated in *Morrison*, "it is clear that the *Moench* presumption is not overcome simply by pleading and proving that the price of the employer's stock dropped steeply, even when the drop was based on the disclosure of some type of misconduct."  *Morrison*, 607 F. Supp. 2d at 1052.  That is essentially all that plaintiffs offer in the SAC.

A second problem with the SAC is that it is *literally* a securities-fraud complaint masquerading as an ERISA complaint. In fact, it appears that plaintiffs simply copied, word-for-word, much of the securities-fraud complaint filed in *Minneapolis Firefighters' Relief Association*. Probably for that reason, the SAC contains dozens (if not hundreds) of allegations that have nothing to do with this ERISA action. For example, the SAC recites numerous allegedly misleading statements that defendants made in their corporate capacity to the news media, during conference calls, and at various industry and investor conferences. It is not clear whether plaintiffs are alleging that these statements were *also* made in a fiduciary capacity, as would be necessary for these statements to be actionable under ERISA. If plaintiffs are, in fact, alleging that defendants made these communications in their fiduciary capacity, the factual basis for that allegation is not clear.[14] Plaintiffs also include over fifteen pages of allegations concerning statements defendants made after the class period *ended* without even trying to explain why these statements are relevant.

A third problem is that, despite its oppressive length, the SAC fails to make clear what plaintiffs think defendants ought to have disclosed and when plaintiffs think defendants ought to have disclosed it. These contentions do not have to be plead with precision, but defendants are entitled to fair notice of plaintiffs' disclosure claims and the grounds on which they rest. *Twombly*, 550 U.S. at 555. When the Court pressed plaintiffs at oral argument for specifics

---

[14]One of the assumptions that clearly underlie plaintiffs' disclosure claims is the assumption that any misrepresentations made by Medtronic in SEC filings became fiduciary communications when those misrepresentations were incorporated into the Plan's SPD. As noted above, this Court previously held that SEC filings that are incorporated into an SPD are fiduciary communications for purposes of ERISA. *Morrison*, 607 F. Supp. 2d at 1054-55. Defendants ask the Court to reconsider that holding. The Court is willing to do so, but need not do so now given that it is denying plaintiffs' motion to amend on other grounds.

about their disclosure claims, plaintiffs had precious little to offer (particularly with respect to the Fidelis allegations), giving the strong impression that they have done little more than launch a fishing expedition.

The Court has no intention of wading through hundreds of extraneous allegations to try to identify plaintiffs' claims and the basis of those claims. Instead, the Court will give plaintiffs one opportunity to cure these problems. Specifically, the Court grants plaintiffs permission to file a third amended complaint that is consistent with the terms of this Order. If plaintiffs file such a complaint, and defendants regard the complaint as inadequate, defendants may move to dismiss it. If such a motion is granted, plaintiffs will not be given leave to bring a fourth amended complaint.

Two final points are worth mentioning. First, defendants argue that plaintiffs' proposed disclosure claims regarding allegedly illegal off-label promotion of Infuse are futile because companies are not obligated to accuse themselves of wrongdoing. Whether or not this is true in the context of a securities-fraud action, defendants cite no authority for applying this principle in the context of an ERISA action. As the Eighth Circuit has recently stated, the fiduciary duties imposed by ERISA are "'the highest known to the law.'" *Braden*, 588 F.3d at 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). The Court would be surprised if ERISA fiduciaries who commit the most egregious violations of their duties by acting illegally are shielded from liability precisely because they acted illegally. *Cf. Martin v. Feilen*, 965 F.2d 660, 667 (8th Cir. 1992) (explaining that an ERISA fiduciary who is also a corporate insider may, in appropriate circumstances, be liable for failing to bring a derivative stockholder's action on behalf of the plan, even though such an action would be against the fiduciary himself). The

Court will not import a principle from securities law into an ERISA action without some authority for doing so.

This is not to say that a fiduciary has a duty to disclose any and all general business information that would be of interest to a participant in an EIAP. Rather, it is merely to say that, assuming that the fiduciary is under a duty to disclose certain information, that duty would not disappear when fulfilling the duty would require the fiduciary to accuse himself of misconduct. As indicated in *Morrison*, the Court doubts that fiduciaries have an affirmative duty to provide continuous disclosures about corporate developments, especially when such disclosures are not necessary to correct earlier misleading disclosures. *Morrison*, 607 F. Supp. 2d at 1057. After plaintiffs have clarified their claims and weeded out extraneous allegations, the Court will be in a better position to assess whether plaintiffs have pleaded a viable disclosure claim.

Second, defendants also argue that plaintiffs have failed to allege loss causation in connection with their Infuse allegations. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 347 (2005) (explaining, in a securities-fraud action, that ordinary pleading rules require a plaintiff to provide "some indication of the loss and the causal connection that the plaintiff has in mind" and rejecting the argument that a plaintiff suffers damages merely by purchasing stock at an inflated price). As a practical matter, many courts have interpreted *Dura* to require that, when a plaintiff alleges that she purchased stock at a fraudulently inflated price, the plaintiff must further allege some type of corrective disclosure followed by a drop in stock price. *See, e.g.*, *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474, 477 (4th Cir. 2006) ("*Dura* requires plaintiffs to plead loss causation by alleging that the stock price fell after the truth of a misrepresentation about the stocks was revealed"). Relying on *Dura*, defendants argue that plaintiffs have failed to

point to any statement that was made during the class period and that revealed the unlawful promotion of Infuse to the market.

The Court is inclined to agree with defendants that the logic of *Dura* governs ERISA actions as well as securities-fraud actions. *Dura* applied a Rule 8 standard and rejected "as a matter of pure logic" the notion that merely purchasing at an inflated price is sufficient to establish loss. *Dura*, 544 U.S. at 342, 346. But prior to *Dura*, the Eighth Circuit held that once an ERISA plaintiff has proven a breach of duty and a prima facie case of loss to the plan, the burden of persuasion shifts to the fiduciary to prove that the loss was *not* caused by the breach. *Martin*, 965 F.2d at 671-72; *accord Roth v. Sawyer-Cleator Lumber Co.*, 16 F.3d 915, 917 (8th Cir. 1994). Moreover, *Martin* explained that "[a]n appropriate measure of damages for manipulating the price of securities is 'the difference between what was paid for the stock, and what would have been paid . . . had the market price not been manipulated.'" *Martin*, 965 F.2d at 671 (quoting *Donovan v. Bierwirth*, 754 F.2d 1049, 1055 (2d Cir. 1985)). *Martin* thus suggests both that an ERISA plaintiff need not prove loss causation and that an ERISA plaintiff could plead loss causation merely by alleging that the plan purchased shares at an inflated price. *Cf. Harris v. Koenig*, 602 F. Supp. 2d 39, 64 (D.D.C. 2009) (citing *Martin* and *Roth* to reject argument that ERISA plaintiffs must plead loss causation).

It is quite possible that *Martin* was abrogated by *Dura*. But even if *Dura* applies here, plaintiffs have nevertheless alleged loss causation. Specifically, plaintiffs allege that, on the last day of the class period, Medtronic revealed that it had received a subpoena from the Department of Justice regarding the off-label use of Infuse. Docket No. 26-1 ¶ 307. Although plaintiffs do not clearly allege that Medtronic's stock price dropped as a result of this disclosure, such an

allegation may fairly be inferred from the SAC, and presumably will be more explicitly alleged in the third amended complaint.

Defendants claim that this allegation is insufficient because the disclosure of a subpoena is not the same as the disclosure of the allegedly unlawful conduct that is under investigation. All that *Dura* requires, however, is that plaintiffs provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347. The Court therefore rejects defendants' argument that plaintiffs' motion to amend should be denied because plaintiffs have failed to plead loss causation.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendants' motion to dismiss plaintiffs' amended complaint [Docket No. 14] is GRANTED, and the amended complaint [Docket No. 8] is DISMISSED WITHOUT PREJUDICE.

2.  Plaintiffs' motion for leave to file a second amended complaint [Docket No. 26] is DENIED.

3.  Plaintiffs may, by May 14, 2010, file a third amended complaint that is consistent with the terms of this Order.

4.  If plaintiffs fail to file a third amended complaint as permitted by paragraph 3 of this Order, the Court will enter a final judgment disposing of this case.

Dated: March 17, 2010                    s/Patrick J. Schiltz_____
                                         Patrick J. Schiltz
                                         United States District Judge